Filed 3/28/22  P. v. Vega CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBERT JAMES VEGA,<br><br>     Defendant and Appellant. | A153620<br><br>(Solano County Super. Ct.<br> No. VCR225774)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>CHANGE IN JUDGMENT |

THE COURT*:

The petition for rehearing filed by appellant Robert James Vega is denied, subject to the following modification of the opinion and judgment filed in this appeal on March 10, 2022:

1.   On page 2, in the second full paragraph which begins, "Vega now appeals, . . . " delete the third sentence which reads:

> Based on newly enacted sentencing legislation that the Attorney General concedes applies retroactively to this case, we shall conditionally vacate the sentence and remand for reconsideration of the sentence imposed.

Insert in place of the deleted sentence indicated above, continuing within the same paragraph, the following substitute language:

---

* Streeter, Acting P. J., Brown, J., Ross, J. (Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution).

Based on newly enacted sentencing legislation, which the Attorney General concedes applies retroactively to this case, and the trial court's failure to consider Vega's service-connected PTSD as a mitigating factor favoring probation under section 1170.9, we shall conditionally vacate the sentence and remand for reconsideration of the sentence imposed.

2. On page 27, in the first paragraph under part II.E., which begins, "Vega contends . . . " delete the second and third sentences which read:

> This claim was forfeited by Vega's failure to object below. (*People v. Scott* (1994) 9 Cal.4th 331, 356; *People v. Neal* (1993) 19 Cal.App.4th 1114, 1117–1124.)  And even on the merits, Vega was presumptively ineligible for probation, and the trial court found no basis to rebut that presumption.  Thus, any error under section 1170.9 did not prejudice Vega.

Delete the paragraph break immediately following the above language so that the paragraph continues with the first sentence of the next paragraph beginning, "Section 1170.9, subdivision (a) requires a finding by the sentencing judge . . . " and concludes at the end of that paragraph after the parenthetical "(Italics added.)".

3. In the paragraph beginning at the bottom of page 27 and continuing on page 28, delete the third sentence and citation immediately following it, which together read:

> But unlike the defendants in those cases, Vega was presumptively ineligible for probation.  (§§ 1203, subd. (e)(2), 12022.53, subd. (g).)

Insert in place of the deletion indicated above, continuing within the same paragraph, the following language:

> In *Panozo*, at pages 840–841, the Fourth District, Division One remanded the case of a defendant convicted of domestic violence offenses to the sentencing court, which had evidenced no awareness of its obligation under section 1170.9 to consider the defendant's prior service in Iraq and service-related PTSD in determining whether probation would be granted.  In so holding, the court rejected arguments that the issue was forfeited by failure to object in the sentencing court and that consideration was rendered unnecessary because the defendant was presumptively ineligible for probation.  (*Ibid.*)  Although

2

imposition of the highest possible term in this case suggests a remand for this error alone would be an idle act, in line with *Panozo*, and because we will remand for resentencing under section 1170, subdivision (b)(1)–(3) and (6), we will also remind the judge of his obligations under section 1170.9.

4. On page 28, delete the full paragraph (including fn. 6) immediately preceding part II.F., which reads:

In such circumstances, the trial court was required to first consider whether the statutory restriction on probation was overcome, then decide whether to grant probation under section 1170.9. (Cal. Rules of Court,[6] rule 4.413(b).) The trial court expressly found no circumstances overcoming the statutory presumption. The probation report called Vega "highly inappropriate for probation." Thus, Vega was not "otherwise eligible for probation" as required by section 1170.9, subdivision (b). The lack of an express finding by the trial court under subdivision (a) of that section did not prejudice Vega.

_____

[6] References to rules are to the California Rule of Court.

5. On page 29, in the second paragraph of part II.F.1., in the fourth sentence beginning, "Defense counsel also argued . . . ," modify the citation, "(rule 4.423(a)(3))," and add footnote 6 within it, so that the citation and footnote read:

(Cal. Rules of Court,[6] rule 4.423(a)(3))

_____

[6] References to rules are to the California Rules of Court.

6. On page 30, in the first paragraph of part II.F.2., which begins, "Vega argues, . . . " adjust the citation immediately after the second sentence, "(*Scott*, *supra*, 9 Cal.4th at p. 353.)," so that it reads:

(*People v. Scott* (1994) 9 Cal.4th 331, 353.)

7. On page 32, in the first paragraph of part II.F.3., immediately following the fourth sentence (which ends, ". . . how Vega was prejudiced."), add "*People v.*" to the *Panozo* citation so that it reads:

(Cf. *People v. Panozo*, *supra*, 59 Cal.App.5th at p. 838 [trial court "did not mention his service-related PTSD"].)

3

8. On page 36, in the first paragraph of part II.I., delete the first sentence which reads:

> By way of supplemental brief, Vega brings to our attention two recent legislative changes that bear upon triad sentencing discretion, effective January 1, 2022.

Insert in place of the deleted sentence indicated above, the following language:

> By way of supplemental brief, Vega brings to our attention recent legislation that bears upon triad sentencing discretion, effective January 1, 2022.

9. Immediately following the new sentence indicated above, insert footnote 7 as follows:

> [7] The legislative history behind Senate Bill No. 567 and two related bills is somewhat complex and potentially confusing, but as pertinent here can be summed up fairly simply. In 2021, during the first year of the 2021–2022 legislative term, three bills proposing various changes to the Penal Code, including amendments to section 1170 that ultimately became Senate Bill No. 567, were introduced and then progressed through the Legislature in parallel. All three bills were passed by the Legislature in September 2021 and approved by the Governor on October 8, 2021. (See Stats. 2021, ch. 695, § 5 [Assembly Bill No. 124], effective January 1, 2022; Stats. 2021, ch. 719, § 2 [Assembly Bill No. 1540], effective January 1, 2022; Stats. 2021, ch. 731, § 1.3 [Senate Bill No. 567], effective January 1, 2022.) Assembly Bills No. 124 and No. 1540 overlapped with Senate Bill No. 567 in that all three, if enacted, would have amended section 1170 in similar though not identical ways. But because Senate Bill No. 567 was the last bill signed by the Governor and bears the highest chapter number, its amendments to section 1170 prevail over the amendments to that code section specified in the other two bills. (Gov. Code, § 9605, subd. (b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738–739.)

10. Immediately after the new footnote 7 indicated above, in the first paragraph of part II.I., delete the second sentence which reads:

> Both of these new amendments constrain the latitude of sentencing courts to choose from among low, middle, and upper terms in a sentencing triad.

11. On page 36, in the first paragraph of part II.I., in the third sentence which begins, "First, Senate Bill No. 567 creates . . . " delete the word "First," and the comma following it, so that the sentence begins, "Senate Bill No. 567 creates a new presumption . . . ."

12. On page 37, at the end of the first sentence of part III. Disposition, add the language, "and shall comply with its obligations under section 1170.9." so that the sentence reads:

> The sentence imposed on Vega is conditionally vacated, and on remand the court shall resentence him in accordance with newly enacted section 1170, subdivision (b)(1)–(3) and (6) and shall comply with its obligations under section 1170.9.

13. On page 38, in the asterisked footnote, delete the words, "City and" so that the footnote reads:

> * Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Except insofar as the foregoing order modifies the opinion and changes the judgment, appellant's petition for rehearing is denied.

Dated: March 28, 2022                    STREETER, Acting P. J.

Filed 3/10/22  P. v. Vega CA1/4 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT JAMES VEGA,<br><br>    Defendant and Appellant. | A153620<br><br>(Solano County Super. Ct.<br>No. VCR225774) |

In February 2016, while in a confused mental state, Robert James Vega shot and killed an off-duty police officer, who was also his de facto father-in-law and his son's grandfather.  Charged with murder (Pen. Code,[1] § 187, subd. (a)) with personal use of a firearm (§ 12022.53, subd. (b), (c) & (d)), he entered dual pleas of not guilty and not guilty by reason of insanity (NGI). Vega claimed he killed Augustine Vegas (Augustine),[2] whom he loved like a father, in a temporary state of psychosis associated with posttraumatic stress disorder (PTSD), from which he had suffered since returning from military service in Iraq in 2007.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Because several individuals who play a role in this case bear the same surname, members of the Vegas family will be identified by their first names. No disrespect is intended.

1

The prosecutor's theory was that Vega's psychotic state was induced by cannabis consumption and did not qualify as insanity under the law. (See §§ 25, 29.8.) Both psychotic conditions are relatively rare, but the jury sided with the prosecution. In a bifurcated trial, the jury acquitted Vega of murder, convicted him of voluntary manslaughter (§ 192, subd. (a)), found the firearm use allegation true, and found Vega was sane at the time of the crime.

Vega now appeals, alleging prosecutorial misconduct, ineffective assistance of counsel, and improper designation of an expert witness in the sanity phase of the trial, as well as various forms of sentencing error and cumulative error. We conclude Vega's claims either have been forfeited or are without merit. Based on newly enacted sentencing legislation that the Attorney General concedes applies retroactively to this case, we shall conditionally vacate the sentence and remand for reconsideration of the sentence imposed. Subject to that conditional vacatur, we shall affirm in all other respects.

## I. BACKGROUND

### A. *The Guilt Phase of the Trial*

#### 1. Background of the Offense

Vega met Angel Vegas (Angel) shortly after he returned from Iraq, and they became and remained a couple for some seven years thereafter. They had a son together in 2009 named L. Early in their relationship they stayed in Angel's parents' home in Vallejo for approximately three years. Angel's father, Augustine, was a Richmond police officer. Her mother, Sandra Vegas (Sandra), became like a mother to Vega. Vega loved and admired Augustine, who helped him get into the police academy, from which Vega graduated with honors, although he was never hired by a police agency. Vega called Sandra "Mom" and Augustine "Pops."

Angel and Vega lived with her parents until approximately 2012, when they got their own apartment. By the time of the events in this case, they had separated but were coparenting their son and remained on good terms. Vega had his own apartment in Fairfield, and Angel had gone back to live with her parents in Vallejo. Vega visited Angel and her family about three times a week, often staying for dinner.

For a few days before the killing, Vega had been hallucinating voices of what he thought were his downstairs neighbors talking "bad" about him and his family. He confronted the neighbors, but they denied it. Vega was scared and agitated. Angel became concerned about him and did not want him to get into a dispute with his neighbors, so on February 9, 2016, she suggested that he and L. spend the night at her parents' house, and he agreed.

On the morning of February 10, 2016, Sandra noticed that Vega was "not his normal self," and he complained of hearing voices. Vega again planned to spend the night at the Vegas house. Through the evening of February 10, Vega continued hearing voices, and after Augustine and Sandra went to bed, he thought he heard them talking about him. He thought Sandra said she was going to pray for him, and he thought Augustine said, "I'm going to ask him about it, and if he doesn't react right, I'm going to go in there and I'm going to kill him." Augustine regularly kept one of his handguns on the bench next to his bed or on the ledge at the foot of the bed.

At approximately 4:30 a.m. on February 11, 2016, Augustine and Sandra were awakened by Vega, who had been sleeping in Angel's bedroom, shouting, "Everyone in this fucking house wake up right now!" Alarmed, Augustine jumped out of bed, put on his shorts, and proceeded to Angel's bedroom across the hall. As he entered the room, Vega was standing in front of him, holding a 9mm handgun.

Augustine held his arms outstretched before him, his palms facing up, and said, "Rob, man, what's going on?" Vega said: "No, Pops. You tell me what's going on." Vega then shot Augustine twice in the face. L. screamed, "Daddy, don't kill grandpa!" After Augustine fell face-up to the floor, Vega stood over him and said, "I respected you, Pops. I love you." Vega then unloaded his clip—six more bullets—into Augustine's lower torso. Eight bullets struck Augustine; seven of them would have been fatal individually. Meanwhile, Sandra escaped out a second-floor window and jumped off the roof, injuring her ankle, before making it to safety at a neighbor's house.

After the shooting, Vega asked Angel to give L. to him, and she told the child to go with his father. Vega took L. and drove to his apartment in Fairfield. He was picked up by the Fairfield police as he parked his car in front of his apartment. A 9mm handgun, which proved to be the weapon that killed Augustine, was found under the driver's side floor mat of Vega's car.

## 2. Vega's State of Mind Just Before Killing Augustine

Backing up a bit chronologically, on the afternoon of February 10, 2016, Vega called Angel to tell her he had run out of gas, so she picked him up and helped him refuel his car. Angel again invited Vega to stay the night at her parents' house, and he agreed. He arrived at the Vegas home about 4:00 p.m.

Around 5:00 to 6:00 p.m., Vega asked Angel if she heard something and asked her if two men lived next door. She said she had not heard anything but thought two men might live next door. Vega said he knew two men lived next door because he had heard them talking and told her: "People are talking, Angel. Pay attention." Vega reminded Angel of Vega's father, who had suffered from mental illness. She was "weirded out" by Vega's behavior but did not realize he was hallucinating.

When Angel left for work about 7:00 p.m., Vega was watching TV and talking with Augustine, Sandra, L., and Angel's little sister, Mia Vegas (Mia), who also lived there. After putting L. to bed, Vega left the Vegas house and

4

went to his apartment in Fairfield for a while, but he returned to the Vegas home to sleep. Sandra and Augustine went to bed about 10:30 p.m. Their bedroom was across the hall from Angel's bedroom. Vega returned to the Vegas house after about an hour or a little more at his apartment because he heard the voices of his neighbors again and became confused and felt unsafe.

After Angel got home from work around 4:00 a.m., she went upstairs to her bedroom, where Vega and L. were lying in bed. Angel got into bed, too, with L. between her and Vega. Vega started talking about love and repeatedly said God was talking to him about love, God wanted him to spread God's love, but nobody had shown him the love they should have. When Angel suggested they postpone the discussion until morning, Vega became increasingly emotional, his voice started shaking, he eventually started crying, and he refused Angel's and L.'s repeated entreaties to be quiet.

The noise woke Mia. She came to Angel's bedroom and offered to take L., but Vega refused. Soon, Vega produced a gun, which scared and angered Angel. They argued over the gun. Vega got louder and angrier and kept talking about God's love.

Angel finally told Vega he would have to leave the house if he did not stop. He looked at her with a "blank stare," reached upwards, started almost "growling," and then fell onto his knees and prayed. Vega eventually got back into bed and said they should just go to sleep, but Angel was still scared, so she told him to leave. He did not leave, but again looked at her with a "blank face."

Either Angel or Vega then opened the bedroom door, and she told him if he did not leave, she would wake up her parents. Vega then yelled, "Everyone in this fucking house wake up right now!" The aftermath has already been recounted.

### 3. Vega's Testimony in His Own Defense

Vega testified in his own defense during both the guilt and sanity phases of the trial. Vega lived with his mother until he was 14 years old, then moved in with his grandparents in Lancaster, California. Vega's mother was an alcoholic and his father was mentally ill and talked to himself.

After graduating from high school in 2003, Vega joined the Army, from which he was honorably discharged in 2007. During his tour of duty he served in the Middle East in both Kuwait and Baghdad. The military taught Vega his firearm was his most important asset; while deployed in the Middle East, he was required to keep a weapon and ammunition on his person at all times. While in Iraq, he often heard gunfire all night long and mortars at close range. On one occasion, Vega had to spend an entire day cleaning up rubble and body parts after a truck bomb had blown up a forward operating base. Another time Vega witnessed a friend die after a concrete wall collapsed on him and crushed him to death.

After returning to civilian life, Vega soon purchased a 9mm handgun and would usually sleep with the gun in his bed or within arm's reach. Vega had trouble sleeping after leaving the Army and had a heightened suspicion of others. He would spend long periods crying. In 2008, he began seeing a psychologist at the Veterans Administration, Dr. Jerry Boriskin. Dr. Boriskin testified he diagnosed Vega with PTSD, a complex or severe variant, with severe and acute symptoms, which included anxiety, hypervigilance, and bouts of sudden and prolonged crying.

Angel also testified that Vega was very religious, frequently reminding others of God's love, reading from the Bible, and sending scripture to Angel "all the time." This religious inclination also showed itself in his religious fervor on the night he shot Augustine.

As for the events on the night in question, Vega testified to hearing Augustine's voice threaten to kill him. When Augustine entered Angel's

bedroom, he made eye contact with him and remembered nothing after that. He believed Augustine was armed and was coming to kill him, and testified he acted in self-defense.

### 4. The Jury's Verdict

Vega was charged with murder of Augustine (§ 187, subd. (a)), with personal use of a firearm (§ 12022.53, subds. (b), (c) & (d)), and kidnapping of L. (§ 207, subd. (a)). The case never went to trial on the kidnapping charge.[3] The jury was instructed on self-defense and imperfect self-defense. The jury acquitted Vega of murder, convicted him of voluntary manslaughter (§ 192, subd. (a)), and found the firearm use allegation true.

## B. *The Sanity Phase of the Trial*

The parties stipulated the evidence introduced in the guilt phase of the trial could be considered in the sanity phase.

### 1. The Defense Case

#### a. *Vega's Testimony*

Anticipating the prosecution's expert testimony that his psychosis was cannabis-induced, Vega testified he first smoked marijuana when he was 18 and started smoking it every day soon after he returned from the Army. He abstained from marijuana entirely from June 2011 to December 2014, when he was in the police academy and was applying to various police agencies. The effects of marijuana lasted an hour or two and included stress relief, help with sleep, and a general sense of well-being. Vega did not consider marijuana to be harmful because, unlike alcohol and hard drugs, with which his family had had serious addiction problems, he did not know anyone who had such problems with marijuana.

Vega had never experienced hallucinations before February 6, 2016, which was when he first started hearing voices. He did not smoke marijuana

---

[3] Vega suggests the charge was dropped by the prosecution before trial. We are unable to confirm that in the record.

that day because he spent the day with his son, and he never got high around his son. After he put his son to sleep at night, he heard what he believed to be his neighbors talking about him, saying things they could only know if they had been watching him, like "what kind of man sleeps with his cat?"

The next day, February 7, 2016, was Super Bowl Sunday, and Vega heard voices just before the game came on TV, and he had not smoked marijuana. He also heard voices later that evening, but he could not remember what they said.

On Monday February 8, 2016, Vega took his son to school in the morning and smoked marijuana afterward. Vega smoked marijuana again at around 9:00 p.m. and, at around 11:00 p.m., heard voices that were more critical and sexually suggestive than before. Vega asked several neighbors about it, but they denied having said anything about him. He did not remember what had occurred on Tuesday, February 9, 2016, and did not remember if he had smoked marijuana or had heard voices.

On February 10, 2016, Vega smoked marijuana in the late morning or early afternoon, after he had taken his son to school and had gone to Walmart, but he did not smoke marijuana again that day. When he left the Vegas house on the night of February 10, 2016, he went briefly to his apartment but returned to the Vegas home after an hour or so because he heard the voices of his neighbors again. He did not smoke marijuana during the time he was at his apartment. Vega believed his marijuana use had nothing to do with his hearing voices because he had used the same marijuana for a long time in similar quantities and had never heard voices or experienced anything similar.

b. *Dr. David Howard's Testimony*

Dr. David Howard, a clinical and forensic psychologist retained by the defense to evaluate Vega's sanity, testified Vega had suffered from temporary psychotic disorder when he shot Augustine, which had caused auditory

8

hallucinations for three or four days, and as a result he was legally insane under California law. While Dr. Howard believed Vega understood the nature and quality of his act, he concluded Vega was incapable of appreciating that it was legally or morally wrong. Dr. Howard explained that temporary psychotic disorder was relatively rare, it involved disordered thinking and hallucinations or delusions that could last from one day to one month. The disorder was primarily caused by genetic predisposition and acute stress, such as divorce, separation from loved ones, isolation, and work problems.

Dr. Howard concluded Vega's psychosis was acutely precipitated by stress related to his relationship with Angel, his isolation, his lack of a broad, healthy network of social support, and the fact that he had less contact with his son than he wanted. Dr. Howard thought Vega's father's mental illness was likely a contributing factor. Dr. Howard also concluded Vega's symptoms during the offense, which included increased reactivity, anxiety, intrusive thoughts, and paranoid ideation, were consistent with, and likely occurred in association with, PTSD. The results of the Miller Forensic Assessment of Symptoms Test led Dr. Howard to conclude Vega was not malingering.

Dr. Howard testified that he had relied in part on the opinion of a forensic scientist who had reviewed Vega's toxicology screen. The scientist concluded the THC levels in that report represented a maintenance level of cannabis use that likely would have had very little effect on developing paranoia or psychosis. It was more likely Vega was using cannabis to treat a preexisting paranoia. Dr. Howard rejected cannabis-induced psychosis as a diagnosis because there had been no change in Vega's chronic use of cannabis for several years.

c. *Dr. Steven Pittavino's Testimony*

Dr. Steven Pittavino was a forensic and clinical psychologist appointed by the trial court to evaluate Vega's legal sanity at the time of

9

the offense. Dr. Pittavino interviewed Vega three times, communicated with defense counsel and the prosecution, reviewed all the available evidence, and reviewed Vega's jail medical and mental health records. Dr. Pittavino concluded Vega had experienced a brief psychotic disorder at the time of the offense which had been triggered by acute distress, and as a result, he was incapable of distinguishing right from wrong or understanding the nature and quality of his act.

Dr. Pittavino concluded that Vega had suffered from auditory hallucinations, which were based on religious and highly sexualized themes, and that these hallucinations were consistent with brief psychotic disorder. Dr. Pittavino explained that Vega's auditory hallucinations met the criteria for having lasted at least 24 to 48 hours because, although the voices themselves were intermittent rather than constant for that period, they were still part of a delusional process in which Vega believed the voices were real and believed he and his family were in ever-present and increasing danger. Dr. Pittavino concluded that many of Vega's symptoms around the time of the killing, which included hypervigilance, hypersensitivity, difficulty sleeping, impulsivity, increased responsiveness to internal stimuli, and auditory hallucinations, were also consistent with his prior diagnosis of PTSD.

### 2. The Prosecution's Case

#### a. *Vega's Use of Cannabis*

Dr. Boriskin testified that he learned during a treatment session with Vega in September 2010 that Vega was self-medicating with cannabis. Dr. Boriskin warned him against it and advised him that in certain people with PTSD, cannabis use can increase the risk of losing touch with reality.

Dr. William Anderson, a forensic toxicologist who reviewed the toxicology test of Vega's blood sample, which had been drawn about seven hours after the killing, testified that Vega's toxicology report showed not only that he had THC in his system, but that he was a chronic, frequent cannabis

user.  It was likely he had used cannabis within 2 to 24 hours prior to the blood draw.

Much of the jury's knowledge about Vega's use of cannabis came from Dr. Jessica Ferranti, a forensic psychiatrist retained by the prosecution, who evaluated Vega's sanity, and who repeated what he had told her in their interview.  Vega said he first used marijuana when he was 16 but did not become a frequent user until he was 26, when he started using marijuana every day, sometimes in the morning, but usually in the evening.  He used a gram to a gram and a half per day.  Vega usually got a variety of Kush from the cannabis club or from a friend who worked at the cannabis club, but he could not specifically remember what strain of marijuana he had been using during the week leading up to the shooting or where he got it.

A police officer testified, in a search of Vega's apartment on the afternoon of the killing, he smelled burnt cannabis in the living room and found a plastic baggie of suspected cannabis inside an open Bible on the coffee table and some "flakes" of "green stuff" on the table.  The police did not find any remnants of smoked cannabis cigarettes.

b. *John Maike's Testimony*

John Maike, a mental health clinician for California Forensic Medical Group, which had a contract to provide mental health assessments for inmates in the Solano County jail, performed a mental health assessment of Vega about eight and a half hours after the killing.  He was designated an expert in mental health assessments.  Vega told Maike he did not have a mental health history, had not been taking psychotropic medications, did not have any mental health concerns, and was not experiencing hallucinations or paranoia.

According to Maike, Vega's affect and mood were appropriate, he was calm and cooperative, he made eye contact, his speech was clear and logical, and he did not appear to be suffering from psychosis.  Maike estimated the

11

assessment took 15 to 20 minutes, which was average length for an assessment. Maike contacted Vega again on February 17, 2016, and he again indicated he was not suffering from any mental health issues, which was consistent with his presentation.

### c. *Dr. Don Purcell's Testimony*

Dr. Don Purcell, who provided contract psychiatric services at the Solano County jail, evaluated Vega at about 6:30 p.m. on February 11, 2016, and Vega denied having any mental health symptoms other than paranoia. But when Dr. Purcell explained that paranoia meant unusual suspiciousness in a situation that would normally not warrant that reaction, Vega denied being paranoid. Dr. Purcell also conducted brief evaluations of Vega on February 13 and March 17, 2016, and Vega again did not display any mental health symptoms.

Neither Maike nor Dr. Purcell testified to an opinion on Vega's mental state at the time of the crime. Their testimony established only that Vega did not display any signs of psychosis or complain of symptoms of psychosis in the hours, days, and weeks after the killing, while he was in jail custody.

### d. *Dr. Jessica Ferranti's Testimony*

Dr. Ferranti interviewed Vega on January 30, 2017, and learned from Vega that both of his parents had been drug abusers, his father was mentally ill, and Vega himself had been in the military. She nevertheless found his marijuana use was the most significant factor causing his psychotic state on February 11, 2016, when he killed Augustine.

Vega told her he had first experienced auditory hallucinations on Saturday, February 6, 2016, about half an hour after he had put his son to sleep at 9:00 to 9:30 p.m. Dr. Ferranti testified this occurred after he had smoked cannabis, although Vega had testified he did not smoke marijuana that day. Vega went to sleep that night, and when he awakened the next morning—Super Bowl Sunday—Dr. Ferranti testified he felt back to normal.

12

Vega testified he heard voices before the Super Bowl game. Dr. Ferranti testified, however, he had watched the Super Bowl with his son and did not experience any hallucinations. Dr. Ferranti admitted Vega had not told her he did not experience hallucinations before the Super Bowl. Dr. Ferranti testified Vega again put his son to sleep around 9:00 to 9:30 p.m. that night, used cannabis, and experienced auditory hallucinations.

When Vega awoke the next morning on Monday, February 8, 2016, he was not hearing voices but decided to stay home from work anyway because he had not slept well the night before. He again did not experience any hallucinations or delusions during the morning and early afternoon. He believed he smoked cannabis in the afternoon and again in the evening, and his auditory hallucinations began around 5:00 p.m. They lasted a long time and were worse than the day before. Vega contradicted this testimony, testifying he did not tell Dr. Ferranti he had an onset of the hallucinations at 5:00 p.m.

According to Dr. Ferranti, Vega told her when he woke up on Tuesday February 9, 2016, he was not experiencing hallucinations, but he did not go to work that day, either. He smoked cannabis in the evening and experienced auditory hallucinations thereafter. Vega testified he did not remember what happened on February 9.

Vega told Dr. Ferranti he may have smoked cannabis in the morning on February 10, 2016, after he dropped his son at school, and he began experiencing auditory hallucinations during the day. He again experienced them at around 5:00 or 6:00 p.m. when he was in the Vegas home. He experienced them continuously until he was booked into county jail. He told Dr. Ferranti he did not think he had used cannabis while he was at his apartment for about an hour on the night of February 10, 2016. Vega told Dr. Ferranti his auditory hallucinations stopped when he entered the county jail upon his arrest.

13

Dr. Ferranti concluded that Vega was earnest and self-disclosing and was not malingering. She believed he was psychotic at the time he shot Augustine, and as a result, he was incapable of appreciating the wrongfulness of his acts. Still, Dr. Ferranti opined that Vega did not meet the legal definition of insanity because his psychosis was the result of voluntarily ingesting cannabis, as demonstrated by the temporal relationship between his use of the drug and the onset of his symptoms. Dr. Ferranti therefore diagnosed him with cannabis-use disorder and cannabis-induced psychotic disorder, the symptoms of which were eliminated when he was separated from the substance. Such a temporary drug-induced psychotic disorder precludes a finding of NGI. (See §§ 25, 29.8.)

Dr. Ferranti acknowledged that cannabis induces psychosis only "[i]n rare cases." She also knew Vega had used cannabis chronically for years without experiencing auditory hallucinations, and there was no evidence he had used a variety of cannabis prior to the shooting that was at all different from what he had been using previously. Although Vega likely was not under the influence of cannabis when he killed Augustine, Dr. Ferranti stood by her diagnosis of cannabis-induced psychosis because the disorder often lasts one to three days after cannabis use. Dr. Ferranti rejected temporary psychotic disorder as a diagnosis because the hallucinations did not persist for a solid 24 hours, there were no immediately precedent stressors that would have triggered such a psychosis, and the rapid remission of symptoms after Vega's arrest reinforced her diagnosis.

### 3. The Jury's Verdict and the Sentence

The jury sided with Dr. Ferranti, evidently concluding Vega's use of cannabis was the precipitating factor causing his break with reality. The jury found Vega was sane when he committed the offense. As discussed in more detail in part II.F.1., *post*, the court sentenced Vega to 21 years in prison.

# II. DISCUSSION

## A. *Prosecutorial Misconduct in Closing Argument in the Sanity Phase*

Vega raises no issues relating to the guilt phase of the trial. With respect to the sanity phase, however, he contends the prosecutor engaged in extensive misconduct during closing argument: (1) improperly vouching for Dr. Ferranti especially, but also for Dr. Purcell and John Maike; (2) improperly disparaging Dr. Howard and Dr. Pittavino; (3) misstating the law; and (4) misstating the evidence and going outside the evidence.

### 1. Forfeiture by Defense Counsel's Failure To Object

" ' "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process.' " ' " [Citation.] ' "Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " [Citation.] 'When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' [Citation.] Prosecutorial misconduct can result in reversal under state law if there was a 'reasonable likelihood of a more favorable verdict in the absence of the challenged conduct' and under federal law if the misconduct was not 'harmless beyond a reasonable doubt.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 333–334 (*Rivera*).)

We agree with Vega that some of the claimed errors would be considered prosecutorial misconduct, such as vouching (*Rivera, supra,* 7 Cal.5th at p. 336), telling the jury that prosecution witnesses would lose their jobs or face discipline if they lied (*People v. Rodriguez* (2020) 9 Cal.5th 474, 481–483), misstating the law (*People v. Fayed* (2020) 9 Cal.5th 147, 204), misstating the evidence (*ibid.*), and going outside the evidence (*ibid.*;

*Rodriguez*, at p. 480).[4]  We question, though, whether the specific statements by the prosecutor in this case would legitimately fall into these forbidden categories.  We also do not think his conduct could be called " ' "deceptive or reprehensible." ' "  (*Rivera*, at p. 333.)  More to the point, however, we conclude Vega's accusations of prosecutorial misconduct were forfeited by his counsel's failure to contemporaneously object and request an admonition.

"Where the defendant does not contemporaneously object to alleged misconduct, we generally decline to review the claim on appeal unless a timely admonition could not have cured the harm."  (*Rivera*, *supra*, 7 Cal.5th at p. 334; see *People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*); *People v. Johnsen* (2021) 10 Cal.5th 1116, 1164–1165.)  Vega asserts we should nevertheless address his prosecutorial misconduct claims for three reasons: (1) the misconduct affected his substantial rights; (2) an objection "would have only further emphasized the prosecutor's improper and highly prejudicial arguments"; and (3) this court has "discretion to consider the misconduct anyway."  We reject Vega's attempt to bring himself within these exceptions to the rule.

Whether the alleged error in the prosecutor's argument affected Vega's "substantial rights" is immaterial to the forfeiture of a prosecutorial misconduct claim; that exception applies only to instructional error.  (§ 1259.) Vega relies on the federal "plain error" doctrine (e.g., *U.S. v. Combs* (9th Cir. 2004) 379 F.3d 564, 568, 572) but cites no authority for the proposition that the federal "plain error" standard for avoiding forfeiture applies to prosecutorial misconduct claims in California state sanity trials.  On the

___

[4] On the other hand, Vega's claim of misconduct based on disparaging defense experts is unfounded.  " 'Argument may not denigrate the integrity of opposing *counsel*, but harsh and colorful attacks on the credibility of opposing *witnesses* are permissible.' "  (*Rivera*, *supra*, 7 Cal.5th at pp. 334–335.) Besides, the prosecutor's comments about Drs. Howard and Pittavino were grounded in the evidence and were neither extreme nor unfair.

contrary, *People v. Arias* (1996) 13 Cal.4th 92, 159 rejected a "plain error" argument where a capital defendant did not object to the prosecutor's comments. (Accord, *People v. Redd* (2010) 48 Cal.4th 691, 731, fn. 19; *People v. Benavides* (2005) 35 Cal.4th 69, 115.)

Next, citing *People v. Hill* (1998) 17 Cal.4th 800, 820–821, Vega argues that "objecting likely would have only further emphasized the prosecutor's improper and highly prejudicial arguments." This exception applies only in cases of extreme and pervasive misconduct that create a "poisonous" atmosphere at trial. (*People v. Riel* (2000) 22 Cal.4th 1153, 1212–1213.) That did not happen here.

Finally, Vega argues "[a]n appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) That may be true, but we are advised our discretion "should be exercised rarely and only in cases presenting an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) This case presents no such issue. We have considered the prosecutor's statements in context and conclude further discussion of the merits would not, in any case, benefit Vega. He may not avoid the normal forfeiture rule.

### 2. Defense Counsel's Failure To Object to Alleged Prosecutorial Misconduct

Vega next contends his trial counsel was ineffective for failing to object to the prosecutor's arguments. " 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*Centeno, supra*, 60 Cal.4th at p. 674.) Such a defendant "bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*Ibid.*; *Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).) Vega cannot show either.

17

A Court of Appeal " 'shall presume that "counsel's performance fell within the wide range of professional competence," ' " and "[w]hen the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ' " 'no conceivable tactical purpose' " for counsel's act or omission.' " (*Centeno, supra*, 60 Cal.4th at pp. 674–675.) And because tactics are involved, " 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' " (*Id.* at p. 675.)

Vega argues that "objecting would not have cured the misconduct . . . and objecting likely would have only further emphasized the prosecutor's improper and highly prejudicial arguments." We reject the first of those propositions as unfounded. There is no reason why an admonition would not have cured the assumed error. Even if we were to accept the truth of his second proposition, defense counsel could have reached the same conclusion himself and decided not to object for tactical reasons. Accordingly, Vega has not shown counsel's failure to object was objectively unreasonable.

Vega also fails to demonstrate prejudice, "that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Centeno, supra*, 60 Cal.4th at p. 676.) We are convinced, even considering the merits of Vega's claims, an objection to the prosecutor's comments would not have led to a more favorable result for Vega. The jury was instructed that an attorney's argument is not evidence (CALCRIM No. 104), and it is presumed to have followed that instruction (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152). Accordingly, Vega's claim of ineffective assistance of counsel fails.

## B. *Alleged Ineffective Assistance of Counsel for Deficiency in Objecting to, Presenting, and Arguing Evidence*

Vega argues his trial counsel was ineffective for failing to object to Dr. Ferranti's testimony on the following subjects: (1) "the statistical probability of someone in [Vega]'s position suffering from temporary

psychosis"; (2) that "states which had legalized cannabis had seen 'a big' increase in fatal traffic accidents involving cannabis"; (3) that California "did not have 'labs that actually test cannabis . . . [for] mold and heavy metals, things of that nature' "; (4) that certain individuals "were more susceptible to cannabis-induced psychosis" "because the cannabis [they] used could have been contaminated" and Vega could have been one of them "because he could have experienced various 'concurrent physiological stressors,' such as dehydration," and (5) that "the Penal Code required that an alienist evaluating sanity conduct a 'detailed history' and 'a detailed analysis' of the defendant's drug use."

## 1. Vega's Claims of Deficient Performance by Defense Counsel

As noted above, a defendant alleging ineffective assistance of counsel bears the burden of showing both deficient performance and prejudice. (*People v. Riel*, *supra*, 22 Cal.4th at p. 1175.) " 'Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' " (*Id.* at p. 1185.)

### a. *Probability Evidence*

Dr. Howard testified on direct examination that brief psychotic disorder was "[r]elatively uncommon," occurring in "about 9 percent" of first onset psychoses, and the disorder affects women more than men. It is caused by genetic predisposition coupled with stressors. On cross-examination Dr. Howard testified he has diagnosed "between 5 and 10 percent" of his patients with brief psychotic disorder. Dr. Howard acknowledged the DSM reports the disorder is more common in developing countries and "on average these episodes last at least 17 days."

Most of this evidence was elicited by defense counsel himself, and he used it to argue to the jury that brief psychotic disorder is "not that rare" and to undermine the prosecution's theory of cannabis causation by emphasizing

19

the similar rarity of that diagnosis. He reasonably could have decided as a tactical matter to elicit probability evidence and not to object to the prosecutor's questions in the same vein.

Vega challenges the use of this evidence because he contends "the probabilities cited by the prosecutor were entirely irrelevant to the issue that the jury was called upon to resolve, improperly invaded its province of determining the ultimate issue, and skewed the result by 'placing a thumb on the scale for guilt,'" quoting *People v. Wilson* (2019) 33 Cal.App.5th 559, 571. Vega erroneously relies on cases involving child sexual abuse accommodation syndrome in which experts testified to the very small proportion of false allegations of child sexual abuse, which the prosecution translated into a very high probability the child accuser was telling the truth. (*Wilson*, at pp. 568–571; *People v. Julian* (2019) 34 Cal.App.5th 878, 885–887; see *People v. Lapenias* (2021) 67 Cal.App.5th 162, 178–181 [expert testimony that it is "'rare'" for child victims to make false accusations was inadmissible].) Such statistics are inadmissible because they invade the province of the jury to determine credibility of witnesses. (*Wilson*, at p. 571.) And at the same time, such probabilities are irrelevant to the issues at trial because they tell the jury nothing about whether this specific allegation is false. (*Id.* at pp. 570–571.)

The use of statistics in this case was altogether different in that the statistics were relevant to the incidence of Vega's psychosis, not the truthfulness of any witness. The statistics were about the likelihood of competing diagnoses. The statistical evidence showed both forms of psychosis were similarly rare. Dr. Ferranti testified on direct examination that all substance-induced psychosis accounts for about 25 percent of first onset psychoses, occurring much more commonly with cocaine and methamphetamine, while cannabis-induced psychosis was "rare."

The probability evidence did not "plac[e] a thumb on the scale for guilt" (*People v. Wilson, supra,* 33 Cal.App.5th at p. 571) because the evidence remained evenly balanced, not severely tilted in one party's favor as in the child sexual abuse cases. Nor did it invade the province of the jury, which remained in full control of puzzling through the numbers, together with all the other evidence, to determine which rare psychosis Vega was more likely suffering when he killed Augustine. Vega has not shown there was no conceivable basis for counsel's handling of this issue.

b. *Increase in Traffic Fatalities in States Legalizing Cannabis*

Vega faults defense counsel for failing "to object and move to strike Dr. Ferranti's testimony that states which had legalized cannabis had seen 'a big' increase in fatal traffic accidents involving cannabis." Vega contends this evidence was irrelevant and "had a tendency to prejudice the jury against cannabis and cannabis users." The evidence was relevant to correlate cannabis use with mental or physical impairment.

Vega also claims Dr. Ferranti's assertion was incorrect based upon a study—outside the appellate record—that supposedly "found that there was no increase in traffic accidents, let alone fatal ones, after recreational cannabis legalization in Washington and Colorado." We are not prepared to hold defense counsel to a standard of being aware of every study ever published on a subject that may come up tangentially in expert testimony through an unobjectionable question. Defense counsel could reasonably have decided to forgo objecting to avoid wading into the conflicting, unsettled evidence correlating marijuana legalization and traffic collision data. Nor would the trial have turned out differently if the parties had further hashed out their disagreement on this point.

c. *Whether California Labs Tested Marijuana for Contaminants*

Vega contends "Dr. Ferranti's claim that California did not have laboratories to test [cannabis] was also incorrect, as California law in fact

required that recreational and medical marijuana be test[ed] in a state-certified laboratory . . . ."  The issue arose in connection with Dr. Ferranti's testimony that contaminants, such as mold or heavy metals, could increase the likelihood that a user of cannabis would develop a psychosis.  Vega cites former Business and Professions Code section 26101 (now, and at the time of trial, Bus. & Prof. Code, § 26100), which requires laboratory testing of cannabis sold in California.  Dr. Ferranti testified, "[C]urrently, although it's going to change is my understanding, in the state of California, but currently there's no regulation, so there isn't a laboratory testing of marijuana that comes from dispensaries currently."  The significance of the testimony was that contamination of the cannabis that Vega consumed around the time he killed Augustine could not be ruled out and was one factor that could suggest Vega may have been suffering from cannabis-induced psychosis.

Counsel could reasonably have decided not to move to strike Dr. Ferranti's testimony because the statute requiring testing upon which Vega relies did not become effective until November 2016, after the killing at issue here.  That statute, even if in effect when Dr. Ferranti testified, did not establish the existence of laboratories that would have tested Vega's cannabis in February 2016.  The law did not require testing of marijuana at the time of the offense and there was no evidence that a lab in fact tested the marijuana Vega had consumed before the killing.[5]  Vega goes far outside the appellate record to attempt to prove to us that some labs testing medical cannabis existed in California in February 2016, which may have also tested

---

[5] Business and Professions Code section 26101 was renumbered to Business and Professions Code section 26100, which went into effect June 27, 2017, a few months before Dr. Ferranti's testimony.  (Stats. 2017, ch. 27, §§ 65, 66.)  We take judicial notice that the regulatory scheme required to implement the new act was not in place at the time of Dr. Ferranti's testimony in November 2017, and licenses for testing laboratories were to begin being issued on January 1, 2018.  (*Id.*, §§ 1(c), (g) & 5(y).)

recreational marijuana on occasion. But establishing the existence of testing laboratories in California at the time of Dr. Ferranti's testimony still would not have ruled out the presence of contaminants in Vega's marijuana. Counsel could reasonably have decided not to contest Dr. Ferranti's statement, which, even if fully explored, could not have made a difference in the outcome.

### d. *Dr. Ferranti's Testimony About Individuals' Particular Susceptibility to Cannabis-induced Psychosis*

Vega argues counsel should have objected to Dr. Ferranti's testimony that Vega "could have been more susceptible to suffering cannabis-induced psychosis than an average person." He refers to the following colloquy, which the prosecutor initiated by asking what factors "would increase the potential" for a person to "have a psychotic episode based on the ingestion of cannabis."

"[Prosecutor:] And how about the idea that [Vega] at the time could have been having what's called concurrent physiological stressors?

"A. Yes, that's a factor as well.

"Q. What are—what would those physiological stressors be?

"A. There can be many things, like dehydration. . . . Sleep deprivation is a well known one in many neurological conditions, illnesses, viruses, immune responses, contaminants contained in cannabis, like mold and heavy metals, things of that nature, which are well documented in states where there are labs that actually test cannabis."

Vega contends there "was no evidence whatsoever" that he was suffering from some of these conditions, and it was "sheer speculation" for Dr. Ferranti to insinuate he was more susceptible to psychosis based on the other factors.

Contrary to Vega's characterization, we do not read Dr. Ferranti's testimony to mean that Vega had, in fact, been suffering from every single one of the conditions she specified. Rather, she was listing the types of physiological stressors that "can be" factors causing a person to experience psychosis from consuming marijuana. We are confident the jury would have

23

understood the question and answer as pertaining to general influencing factors, not those specific to Vega. This evidence bore directly on Dr. Ferranti's diagnosis and thus was relevant. An objection would have been overruled. Indeed, counsel could tactically have decided not to object to avoid appearing as if he were trying to hide information from the jury. Accordingly, Vega has failed to demonstrate that counsel's performance was objectively unreasonable.

Vega faults counsel for failing to object "to irrelevant and speculative evidence that people who had a 'genetic predisposition,' 'post-synaptic irregularities in the brain,' and 'metabolic irregularities' were more susceptible to cannabis-induced psychosis." The prosecutor asked Dr. Ferranti what factors could increase the risk of a person suffering from cannabis-induced psychotic disorder, and Dr. Ferranti testified that such factors included genetic predisposition or metabolic irregularities like dehydration, medical problems, or physical exertion. Vega asserts, "[T]here was no evidence whatsoever that [Vega] suffered from any of these conditions." That's the same thing his attorney told the jury.

Again, Vega's appellate counsel reads the testimony as an assertion that Vega did, in fact, suffer from all the named conditions. But that is a dubious reading of what was essentially a list of relevant clinical factors Dr. Ferranti considered in making her diagnosis. Such testimony is not objectionable.

Vega argues the foregoing testimony "opened the door for the prosecutor to argue, without evidence, that [Vega]'s use of cannabis was like a ticking time [*sic*: bomb] because he had 'all' of the risk factors identified by Dr. Ferranti." Even if defense counsel should have objected to the prosecutor's argument as misstating the evidence, that provides no basis for arguing he should have objected to the question that elicited Dr. Ferranti's

testimony or should have moved to strike the testimony, which are the only issues he raises on appeal.  Vega's claims lack merit.

### e.  *Penal Code Requirements for Drug Use History*

Vega asserts counsel should have objected to Dr. Ferranti's testimony that the Penal Code requires an alienist to "do a detailed history of the individual's drug use pattern specifically on the day of the offense."  Vega acknowledges that section 1027 requires an alienist to assess " 'the substance use history of the defendant on the day of the offense,' " but contends "[t]here is no requirement for a 'detailed' history or analysis."  Counsel could have decided to refrain from objecting as a sound trial tactic.  Objecting to the adjective "detailed" might have struck the jury as nit-picking.  Such an issue could better be dealt with on cross-examination or in closing argument if the attorney thought it was important.

## 2.  Prejudice

Vega has also failed to demonstrate that counsel's not objecting to any of this evidence prejudiced the defense.  Vega failed to show improper admission of any piece of evidence, and the result of the proceedings would not have changed even had defense counsel objected.  Accordingly, his claim of ineffective assistance fails.  (*Strickland*, *supra*, 466 U.S. at p. 694.)

## C. *The Court's and Counsel's Alleged Errors in the Designation of Experts*

Vega claims the court erred in allowing Dr. Ferranti to be designated an expert, over defense objection, in NGI assessments, as well as in forensic psychiatry, as opposed to simply an expert in the field of forensic psychology, as defense experts Drs. Pittavino and Howard had been designated.

The prosecutor successfully designated Maike as an expert in mental health assessments and Dr. Purcell as an expert in psychiatry and mental health assessments.  The prosecutor offered Dr. Ferranti as an expert in forensic psychiatry and "not guilty by reason of insanity assessments."  Defense counsel objected to the latter area because it "ventures too close to

the ultimate question in the case." The trial court overruled Vega's objection: "[U]ltimately, the jury will assess her qualifications, and they'll be instructed accordingly." The judge designated Dr. Ferranti as an expert in the areas of forensic psychiatry and NGI assessments.

A trial court's designation of a witness as an expert in a particular field is reviewed for abuse of discretion. (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 39, overruled on other grounds in *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 543.) "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) In addition to her general psychiatric credentials, Dr. Ferranti has a subspecialty and board certification in forensic psychiatry, which relates to "issues at the intersection of various matters under the law and mental illness," including pleas of NGI. She had been teaching forensic psychiatry at U.C. Davis for more than seven years. Since 2010, she had been on expert panels in four California counties "as a neutral examiner," including consulting on NGI cases and rendering an opinion about whether the statutory requirements were met. She had performed numerous NGI assessments, although she "[o]ften" was not called to testify after her assessment was complete. Given this education and experience, the trial court's designation of Dr. Ferranti as an expert in NGI assessments was not an abuse of discretion.

Alternatively, Vega argues his trial counsel's failure to recall Drs. Howard and Pittavino for the purpose of redesignating them as experts in NGI assessments deprived him of his Sixth Amendment right to effective assistance of counsel. (See *Strickland, supra*, 466 U.S. at pp. 684–685.) We think counsel could well have decided not to make a mountain out of a molehill. The trial court was correct that the jury would ultimately decide the issue based on each expert's credentials and the persuasiveness of their

opinions, not the designated area of their expertise. We see no professional error and no prejudice.

## D. *Alleged Cumulative Error*

We have concluded that the various errors alleged by Vega either were forfeited or have no merit. (See pts. II.A.–II.C., *ante*.) Even if there were errors, they were individually harmless, and even considered in combination, they had no discernable effect on the jury's decision. Therefore, we reject without further discussion Vega's claim of cumulative error.

## E. *Court's Failure To Consider Probation Under Section 1170.9*

Vega contends the trial court erred by failing to make a finding concerning his PTSD diagnosis and its relation to his military service and to consider that as a factor in favor of granting probation, pursuant to section 1170.9. This claim was forfeited by Vega's failure to object below. (*People v. Scott* (1994) 9 Cal.4th 331, 356; *People v. Neal* (1993) 19 Cal.App.4th 1114, 1117–1124.) And even on the merits, Vega was presumptively ineligible for probation, and the trial court found no basis to rebut that presumption. Thus, any error under section 1170.9 did not prejudice Vega.

Section 1170.9, subdivision (a) requires a finding by the sentencing judge whether Vega "may be suffering from" service-related "substance abuse" or "mental health problems," including PTSD. Section 1170.9, subdivision (b)(1) provides, "If the court concludes that a defendant convicted of a criminal offense is a person described in subdivision (a), *and if the defendant is otherwise eligible for probation*, the court shall consider the circumstances described in subdivision (a) as a factor in favor of granting probation." (Italics added.)

The Attorney General acknowledges the trial court "made no eligibility determination as to whether [Vega] had a qualifying service-related condition" as required by section 1170.9, subdivision (a). (*People v. Panozo* (2021) 59 Cal.App.5th 825, 835–841; *People v. Bruhn* (1989) 210 Cal.App.3d

1195, 1198–1200.)  But unlike the defendants in those cases, Vega was presumptively ineligible for probation.  (§§ 1203, subd. (e)(2), 12022.53, subd. (g).)

In such circumstances, the trial court was required to first consider whether the statutory restriction on probation was overcome, then decide whether to grant probation under section 1170.9.  (Cal. Rules of Court,[6] rule 4.413(b).)  The trial court expressly found no circumstances overcoming the statutory presumption.  The probation report called Vega "highly inappropriate for probation."  Thus, Vega was not "otherwise eligible for probation" as required by section 1170.9, subdivision (b). The lack of an express finding by the trial court under subdivision (a) of that section did not prejudice Vega.

## F. *Alleged Ineffective Assistance of Counsel in Sentencing*

Vega contends trial counsel was ineffective at sentencing in three ways: (1) failing to object to dual use of an aggravating factor to impose the upper term for manslaughter and the upper term for the firearm use enhancement; (2) failing to argue service-related PTSD as a mandatory mitigating factor under section 1170.91; and (3) failing to file a sentencing memorandum despite the presence of mitigating evidence.

### 1.  The Sentencing Proceedings

The prosecutor filed a memorandum seeking the upper term of 11 years for voluntary manslaughter and the 10-year upper term for the firearm use enhancement.  The defense did not file a sentencing memorandum.

After hearing numerous impact statements, the trial court heard argument from the attorneys.  Defense counsel acknowledged the case involved great violence, that Vega had been armed with a weapon, and the victim was vulnerable.  He argued against several other aggravating factors urged by the prosecution in its sentencing memorandum, however, including

---

[6] References to rules are to the California Rules of Court.

that Vega's actions showed "cruelty and callousness," that he had taken advantage of a position of trust, and that his crimes were of increasing seriousness. Defense counsel also argued factors in mitigation, including that "the crime was committed because of an unusual circumstance and would be unlikely to reoccur" (rule 4.423(a)(3)); that Vega had an insignificant prior record (rule 4.423(b)(1)); and that he suffered from a mental condition reducing his culpability (rule 4.423(b)(2)). Defense counsel also argued that "the genesis of the defendant's mental state was service to his country, whether that was PTSD or self-medication for that with marijuana." Defense counsel requested the lower term for manslaughter and the middle term for the firearm use enhancement, which would have resulted in an aggregate prison term of seven years if imposed consecutively. (§§ 193, subd. (a), 12022.5, subd. (a).)

The prosecutor relied on his brief but also noted Vega "didn't have to go to the extent that he did" by shooting Augustine eight times total, six times after he "was already incapacitated or deceased."

The trial court rejected probation and found the following factors in aggravation: (1) "the crime involved great violence, great bodily harm and other acts disclosing a high degree of cruelty, viciousness, and callousness" (rule 4.421(a)(1)); (2) "the victim was particularly vulnerable" (rule 4.421(a)(3)); and (3) "the defendant has engaged in violent conduct that indicates a dangerousness to society" (rule 4.421(b)(1)). The court found the following factors in mitigation: (1) "the defendant's prior record is not significant" (rule 4.423(b)(1)); (2) "the mental condition of the defendant," including his PTSD (rule 4.423(b)(2)); and (3) Vega "is a veteran" and "was honorably discharged" (rule 4.423(c)).

The trial court commented, "[T]he aggravating factors literally jump off the page." It considered the "extreme" violence and Augustine's vulnerability to be "the most significant factors in determining what is this in the spectrum

29

and in the continuum of manslaughter." Because he found the aggravating factors "dominate[d]" the case, the judge imposed the upper term of 11 years for manslaughter. The judge also imposed the 10-year upper term on the firearm use enhancement, adopting the same aggravating and mitigating factors. Thus, Vega was given the maximum term possible.

### 2. Counsel's Failure To Object to the Court's Alleged Dual Use of Aggravating Factors

Vega argues, "The trial court's use of the great violence/great bodily injury aggravating factor under rule 4.421(a)(1) . . . constitutes improper dual use under rule 4.420(d) because it constituted an element of voluntary manslaughter" and was "part and parcel of [Vega]'s firearm use." First, Vega's argument is forfeited for failure to raise the issue in the trial court. (*Scott*, *supra*, 9 Cal.4th at p. 353.) Even if great bodily injury could not be considered an aggravating factor because death is an element of voluntary manslaughter (*People v. Duran* (1982) 130 Cal.App.3d 987, 990–991), it is not clear a finding of "great violence" suffers from the same defect. Moreover, "cruelty, viciousness and callousness" transcending bodily harm itself clearly are not elements of manslaughter. (*Id.* at p. 991.) The judge found those factors present in this case based on substantial evidence because Vega delivered far more shots than were necessary to repel what he believed to be Augustine's attack, and he did it all in front of Augustine's daughter and his own son. Contrary to Vega's argument, such factors are sufficient to impose an upper term. "[T]he existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term." (*People v. Black* (2007) 41 Cal.4th 799, 813.) And here the judge found additional aggravating factors.

Nor are any of the rule 4.421(a)(1) factors (great violence/great bodily injury or cruelty, viciousness and callousness) elements of a firearm use enhancement. A firearm use enhancement can be based on a wide range of conduct from merely displaying a gun in a menacing manner to shooting

someone to death, as Vega did. (CALCRIM No. 3146.) Cruelty, viciousness and callousness are not elements, and a court's consideration of those factors does not constitute dual use when imposing the aggravated term for either voluntary manslaughter or a gun enhancement.

Counsel's failure to object to the use of the same findings to support an upper term on the gun use enhancement was not ineffective assistance of counsel. In *People v. Moberly* (2009) 176 Cal.App.4th 1191, the defendant was convicted of voluntary manslaughter with a firearm use enhancement under section 12022.5, subdivision (a). (*Moberly*, at p. 1194.) On appeal, the defendant argued "the trial court erred in relying on a single significant factor to impose the upper term on both the voluntary manslaughter count and the gun use enhancement" because it violated "the prohibition against dual use set forth in *People v. Scott* (1994) 9 Cal.4th 331." (*Moberly*, at p. 1197.) After noting that such use did not violate the "dual use" rule under *Scott* (*id.* at pp. 1197–1198), *Moberly* upheld the upper sentence on the voluntary manslaughter conviction, as well as the upper sentence on the firearm use enhancement (*id.* at p. 1199). *Moberly* concluded "the dual use of a fact or facts to aggravate both a base term and the sentence on an enhancement is not prohibited." (*Id.* at p. 1198.)

The trial court here explicitly relied on *People v. Moberly*, *supra*, 176 Cal.App.4th 1191. The court also found other aggravating factors that would have justified the upper base term and upper term for the gun use. Even had defense counsel made the objection Vega suggests, the court's comments at sentencing leave no doubt, there was no reasonable probability of a better result for Vega.

### 3. Counsel's Failure To Argue That PTSD Was a Mandatory Mitigating Factor and That His Temporary Psychosis Was a Separate Mitigating Factor

Vega contends, "Trial counsel failed to inform the court that [Vega]'s PTSD was a mandatory mitigating factor under section 1170.91, subdivision (a) and that the court should consider his temporary psychosis as a separate disorder under that provision." The fact is that counsel argued PTSD was a mitigating factor but did not point out it was a *mandatory* mitigating factor and did not cite section 1170.91. Other facts are that the probation report recognized his PTSD as a mitigating factor, and the court expressly took Vega's service-related PTSD into account as a mitigating factor. Given these facts, we fail to see how Vega was prejudiced. (Cf. *Panozo*, *supra*, 59 Cal.App.5th at p. 838 [trial court "did not mention his service-related PTSD"].) Defense counsel no doubt saw little advantage in arguing that a mitigating factor already explicitly recognized in the probation report was "mandatory."

Arguing to the court that Vega's temporary psychosis at the time of the crime was a separate disorder reducing his culpability would at best have added one more mitigating factor, but in Vega's view, that would have compelled the trial court to impose the middle terms. But in arriving at a just sentence, "the weighing process is not quantitative only. One aggravating factor can outweigh several mitigating circumstances." (*People v. Zamora* (1991) 230 Cal.App.3d 1627, 1637.) Vega's counting of factors in mitigation and aggravation does not persuade us that counsel's performance was deficient or that he was prejudiced. Accordingly, Vega's claim of ineffective assistance of counsel fails.

### 4. Counsel's Failure To File a Sentencing Memorandum

Vega faults trial counsel for "failing to file a sentencing memorandum at all." His argument and the authorities he cites suggest his true argument is that counsel was ineffective for failing to develop and present mitigating

evidence, including: (1) failing to present to the court the reports of the three alienists who concluded Vega was insane, but especially that of Dr. Janice Nakagawa; (2) Vega's PTSD diagnosis following his military service; (3) Vega's traumatic childhood, including that his parents' drug use once resulted in a house fire; (4) that "most of the victim's family was still supportive of him and had forgiven him for what he had done"; (5) that he had only one prior misdemeanor conviction; (6) that Vega's cannabis use " 'partially excus[ed]' " his conduct (rule 4.423(a)(4)); and (7) that Vega was suffering from a mental condition that "significantly reduced [his] culpability" (rule 4.423(b)(2)). The trial court heard and considered virtually all of this information. Counsel's failure to summarize the evidence in writing did not affect the sentencing decision.

In particular, Vega faults defense counsel for failing to bring the report of Dr. Janice Nakagawa to the court's attention as mitigating evidence. Dr. Nakagawa was a court-appointed psychologist who evaluated Vega's sanity, but who did not testify at trial. Dr. Nakagawa concluded Vega suffered from psychosis at the time of the offense and opined he did not understand the nature and quality of his acts and did not know the difference between right and wrong when he shot Augustine. Perhaps the reason she was not called by the defense, and the reason her report was not emphasized, is that Vega, while admitting chronic use of marijuana, told Dr. Nakagawa he had not smoked any marijuana in the days leading up to the killing.

In any case, Vega highlights the stressors Dr. Nakagawa detailed in her report—some not identified by the testifying experts—as "crucial evidence which had been omitted from trial" that "undermined the prosecution's theory" of cannabis-induced psychotic disorder. The stressors were relevant to Vega's diagnosis and therefore relevant at the sanity phase of the trial. At sentencing it was too late to argue the issue of sanity versus insanity, and the stressors he faced at the time of the crime, such as a

33

deteriorating relationship with Angel's brother, his falling out with his father, and his worry about his mother's health, were irrelevant at sentencing. Counsel was well advised not to reargue the sanity issue at sentencing or to overemphasize Vega's difficult childhood, knowing the judge was aware of that evidence.

Ultimately, given the aggravating factors found by the trial judge and the strength of his opinion that they "dominate" the case, there was no reasonable probability of a different result if counsel had presented Vega's proposed mitigating evidence in writing or argued it more thoroughly in a sentencing brief. (See *Strickland*, *supra*, 466 U.S. at p. 694 [defendant must show prejudice to establish ineffective assistance of counsel]; *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1691–1692 [one aggravating factor may justify upper term].)

## G. *Mental Health Diversion Under Section 1001.36*

Vega argues he was entitled to mental health diversion under section 1001.36 and the matter should be remanded to allow the trial judge to consider diversion. Although that section was not enacted until after Vega's conviction, the California Supreme Court has held it applies retroactively to cases not yet final. (*People v. Frahs* (2020) 9 Cal.5th 618, 631–637.) Vega, however, cannot avail himself of that ruling.

The court sentenced Vega on December 19, 2017. Effective June 27, 2018, the Legislature created a diversion program for defendants with certain diagnosed mental disorders, including PTSD. (Former § 1001.36, subds. (a), (b)(1), Stats. 2018, ch. 34, § 24 (Assem. Bill No. 1810).) That program allows qualifying defendants to be treated in a community mental health program for up to two years, after which, if they perform "satisfactorily in diversion, . . . the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id.*, subd. (e).) Effective January 1, 2019, however, the Legislature amended

section 1001.36 to exclude defendants charged with, among other things, murder or voluntary manslaughter. (Stats. 2018, ch. 1005, § 1; § 1001.36, subd. (b)(2)(A).) Vega nevertheless contends he is entitled to the benefit of the original version of section 1001.36 in effect from June 27, 2018 to December 31, 2018, because application of the restrictive amendments "would violate basic principles against retroactivity and state and federal constitutional bars as to ex post facto legislation."

The same argument was rejected as a "feat of argumentative gymnastics" in *People v. McShane* (2019) 36 Cal.App.5th 245, where the Fourth District, Division Two, concluded "[t]he fact . . . that he was briefly eligible for pretrial diversion under Penal Code section 1001.36, as originally enacted, is irrelevant to the retroactivity analysis." (*Id.* at pp. 259–260; see *People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1050–1051, 1053–1054.) We have no cause to disagree with *McShane* and *Cawkwell*.

## H. *Requested Remand for Resentencing Under Senate Bill No. 620*

When Vega was sentenced, the trial court had no discretion to strike a firearm use enhancement. (Former § 12022.5, subd. (c), Stats. 2011, ch. 39, § 60, effective June 30, 2011, operative Jan. 1, 2012.) On January 1, 2018, after sentencing in this case, amendments in Senate Bill No. 620 to section 12022.5, subdivision (c) took effect, which gave the trial courts discretion to "strike or dismiss" "in the interest of justice" "an enhancement otherwise required to be imposed" by section 12022.5. (Stats. 2017, ch. 682, § 1, subd. (c); see § 1385.) Senate Bill No. 620 is retroactive to all cases not final on appeal at its effective date. (E.g., *People v. Allison* (2019) 39 Cal.App.5th 688, 704–706.)

Vega contends his case should be remanded to allow the trial court to exercise its newly granted discretion. But remand is not warranted here for this reason because the trial court, when it sentenced Vega, acknowledged Senate Bill No. 620 would soon come into effect and expressly stated it would

35

not strike the firearm enhancement even if it had the discretion to do so. A remand under Senate Bill No. 620 would be an idle act and should be avoided. (*People v. Allison*, *supra*, 39 Cal.App.5th at pp. 705–706; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

## I. *Requested Remand for Resentencing Under Senate Bill No. 567*

By way of supplemental brief, Vega brings to our attention two recent legislative changes that bear upon triad sentencing discretion, effective January 1, 2022. Both of these new amendments constrain the latitude of sentencing courts to choose from among low, middle, and upper terms in a sentencing triad. First, Senate Bill No. 567 creates a new presumption that the chosen term shall not exceed the middle term, unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation to them, (2) proven to a jury (or to a court, if jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction. (Stats. 2021, ch. 731, §§ 1.3, 3(c) (Sen. Bill No. 567), adding § 1170, subd. (b)(1)–(3), by amendment.) Senate Bill No. 567 also creates a new presumptive mandate for the low term where the defendant's psychological, physical, or childhood trauma was a contributing factor in the commission of the offense. (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding § 1170, subd. (b)(6), by amendment.) Notwithstanding any mandate under Senate Bill No. 567 to choose a term not exceeding the middle term, section 1170, subdivision (b)(6) will dictate choice of the low term "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).) But even if the low term is not chosen, Senate Bill No. 567 requires imposition of the middle term, except in the circumstances spelled out in section 1170, subdivision (b)(1)–(3). In any case, the court is required to "set forth on the record the facts and reasons for choosing the sentence imposed." (§ 1170, subd. (b)(5).)

Vega argues that these recently enacted statutory revisions are retroactive (*In re Estrada* (1965) 63 Cal.2d 740, 745–748); that both new enactments qualify as ameliorative changes to the sentencing laws governing his convictions (*People v. Conley* (2016) 63 Cal.4th 646, 656); and that, as a result, they must be applied retroactively in this case under *Estrada* (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299). The Attorney General agrees and does not oppose a remand for consideration of this new legislation. In accordance with the Attorney General's concession, we shall order conditional vacatur of Vega's sentence and leave it to the trial court on remand to determine what effect the new legislation may have on Vega's aggregate sentence in a resentencing proceeding.

## III. DISPOSITION

The sentence imposed on Vega is conditionally vacated, and on remand the court shall resentence him in accordance with newly enacted section 1170, subdivisions (b)(1)–(3) and (b)(6). The judgment is otherwise affirmed.

STREETER, Acting P. J.

WE CONCUR:

BROWN, J.
ROSS, J.*

---

\* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.